PITMAN, J.
| j This is an appeal after a remand wherein this court ordered the trial court to conduct an evidentiary hearing on the issue of an alleged breach of a plea agreement by the state. After the hearing, the trial court held that it was the Defendant, Cornelius Young, who had breached his plea agreement. Therefore, it held that the imposition of the original sentences consecutively, which was not in conformity with the plea agreement, was proper. Defendant now appeals. For the following reasons, the sentences are vacated and the matter is remanded with instructions.
FACTS
The original opinion in this case and in which the remand was ordered is State v. Young, 50,072 (La.App. 2 Cir. 8/12/15), 174 So.3d 719 (“Young I”).
On January 6, 2014, Defendant pled guilty to two felony charges (unauthorized entry of a place of business and theft) and one misdemeanor charge (simple battery) pursuant to a plea agreement. He agreed to enter guilty pleas on the three charges and to testify in an unrelated criminal case, State v. Warmack, an aggravated incest and molestation of a juvenile case (“the Warmack trial”), in exchange for concurrent sentences, a presentence investigation (“PSI”) bond reduction and no multiple offender bill. After accepting the guilty pleas, the trial court set Defendant’s sentencing date for June 30, 2014, nearly seven months from the date of the guilty plea, so that he could testify in the Warmack trial scheduled for March 10, 2014.[1] His | pPSI bond was to be reduced to $7,500 as part of the plea agreement; however, because of confusion and a lack of communication between the district attorney (“DA”) and Bayou Dorcheat Correctional Center (“BDCC”), there was a very lengthy delay in the bond reduction paperwork. The Webster Parish Sheriffs Office received notice of the bond reduction on March 7, 2014.
Defendant remained incarcerated throughout the months leading up to the Warmack trial. While the case was being prepared for trial, Defendant wrote letters and made comments to the DA’s office that caused doubt to be cast upon his reliability as a witness. His letters indicated that he feared for his safety once he became known as a snitch among the other inmates and also implied that, because his bond had not been reduced, he would not testify at the Warmack trial unless the state complied with the agreement.
Defendant wrote a letter to the DA postmarked May 21, 2014, which stated that he was “very upset” about not receiving the bond reduction. For that reason, the DA chose not to call him at the Warmack trial even though Defendant was dressed and transported to the courthouse ready to testify on the day he was told to be there. Although he waited for two hours to be called, he was told that it was his “lucky day” and he was not going to testify.
At his sentencing hearing on June 30, 2014, the trial court reviewed Defendant’s PSI and found that he had been convicted of 13 felony offenses, including the two felony offenses for which he was before the court. After the PSI review, it stated as follows:
I will state that at the time you pled guilty the agreement was there would be *909 no multiple offender bill and that if you were—if you testified in the case of State versus Leland Warmack the | ¡¡State was recommending that your sentences would run concurrently with each other. However, you—that case was tried two weeks ago... And you were not—you did not testify. Now whether you were called or refused to testify or you were available and they chose not to call you, I don’t know. I wasn’t privy to that conversation, but all I do know is you did not testify.
It sentenced Defendant to six years at hard labor for unauthorized entry and five years at hard labor for a middle-grade theft, both maximum sentences, and ordered that the sentences be served consecutively. Defendant filed a timely motion to reconsider sentence and argued that the sentences were not in compliance with the plea bargain agreement and were excessive. The trial court denied the motion to reconsider sentence and Defendant appealed.
In Young /, this court remanded with instructions to the trial court to hold an evidentiary hearing to determine whether Defendant breached the plea agreement by refusing to testify at the Warmack trial. This court stated, “If the evidence is not sufficient to show that the defendant was unwilling to fulfill his obligation under the plea agreement, the plea agreement must be enforced, or Young must be allowed to withdraw his guilty pleas.”
On remand, the sole issue to be determined was whether there was a breach of the plea agreement between Defendant and the state such that the subsequent imposition of consecutive, rather than concurrent, sentences was proper.
A contradictory hearing was held on November 9, 2015. The state’s only witness was Angela Hall, an employee of the DA’s office who coordinated Defendant’s testimony for the Warmack trial. Ms. Hall confirmed that there was a communication failure between the DA’s office and the BDCC where Defendant was housed, which delayed, and ultimately precluded, his bonding out before sentencing. According to Ms. Hall, ^Defendant had related to her that, by the time the bond reduction was sent to the jail, his family had spent the “tax money” that was intended to bond him out.
As explained in Young I, the tenor of Defendant’s letters to the clerk of court and DA’s office reflected his belief that the officials wanted him to remain incarcerated until the Warmack trial in order to ensure his presence to testify, while he was relying on the state’s agreement to reduce his bond so that he could spend time with his family in Arkansas prior to sentencing, and that he was afraid for his safety since he would be known as a snitch. Ms. Hall corroborated this, testifying that Defendant was moved several times, primarily due to safety concerns. She testified that “they” were trying to help him pending his sentencing and the Warmack trial.
She testified that, on one occasion, Defendant was brought to the DA’s office for an interview wherein she informed him that his bond had been reduced to $7,500. When he requested to be released on his own recognizance, she informed him the trial judge would probably not agree to that since he had an extensive criminal record. She also testified that, at the time, Defendant had two holds on him from the State of Arkansas. She stated that she allowed Defendant 15 minutes to make phone calls in order to secure funds for .the bond because he advised her that he would not be able to make the calls from the jail. According to Ms. Hall, Defendant told her that his family had spent the money that was supposed to be for his bond. During *910 this meeting, Defendant again expressed his fear for his safety in jail.
During her testimony, Ms, Hall identified handwritten notes of DA Schuyler Marvin in the Warmaek case, referencing Defendant, which stated, “don’t call this guy.” Ms. Hall also identified the May 21, 2014 letter |fias being from Defendant. She testified that the margin notation on the letter was what had led the state to question Defendant’s veracity and whether he would testify at all, even if called. This was the only letter introduced by the state at the hearing. The body of the letter is similar in substance to the other letters authored by Defendant and examined by this court in Young I, in that he complains that the state breached its agreement to let him bond out and expresses concerns for his safety. In the letter, Defendant implies that he understands the importance of his testimony and states that he had an understanding that he would be protected since he was going to testify; however, the point of the letter was to let the DA’s office know that the state was not complying with the agreement since he had been unable to get his bond lowered. The margin notation, relied upon by the state and the trial court for denying Defendant specific performance of the plea agreement, is somewhat illegible; however, Ms. Hall read the notation as follows during her testimony:
P.s. (sic) And I’m not going to testify either ... after all this drama against my freedom never be any chance to see my family or kids or have a chance to see the kids if I have sit in here until the June 16th for trial. I’ll still be—still be a witness. I don’t know what the judge may do. I only be helping your office even after I—even after I was done. I can’t help you if you help me—-ya’ll— something.
Ms. Hall confirmed that DA Marvin’s decision not to call Defendant as a witness was made after his receipt of Defendant’s letter and was based on this margin notation. She also testified that she was aware of no further communication between the DA’s office and Defendant regarding his willingness to testify at the Warmaek trial or to inquire about the meaning of the margin notation on the letter.
| ^Defendant testified that he was War-mack’s cellmate and that Warmaek had told him, “what happened between him [Warmaek] and his daughter.” He described the plea agreement reached in exchange for his testimony against Warmaek and stated that he continually relayed to Ms. Hall that he was receiving threats for being a snitch, after which she would move him. He testified that Ms. Hall allowed him to call his family about bonding out, but he denied ever telling her that his family had spent the “tax money” and that is why he could not make bond. According to him, once the communication issue regarding the bond was corrected and the paperwork was sent to the jail, he was satisfied that the agreement was in place and he intended to testify as agreed. He further testified that his family continued to try to raise the money for his bond, which they were ultimately unable to do. However, because of the “little girl,” the rape Victim, he was prepared to testify.
The state subpoenaed him to appear at the Warmaek trial. Defendant explained:
I voluntarily, I got dressed, they brought me down here. When they brought me down here, Mr. Schuyler Marvin and them had me to go to their office and then they told me that they weren’t going to need me to testify, today was my lucky day. And then they sent me back.
[[Image here]]
*911 I was willing to testify. I was getting ready to come into the courtroom and they told me to hold on. ... they took me to the fourth floor. I sat there for about two hours. I went back. I called Ms. Angela Hall.
Defendant testified about asking Ms. Hall why he did not testify at the War-mack trial. He stated that Ms. Hall explained to him:
|7I’m going to tell you and be honest with you Mr. Young, 'the reason they didn’t call you for witness because due to you not being able to bond, they feel like that I was going to, you know, be mad and hurt them as a witness because they held me in jail all this time and didn’t allow me to bond.
He testified that he was present at the Warmack trial and was willing to testify and uphold his end of the plea agreement. He repeatedly stated that he was concerned for his safety; he advised the court: “But I never, Your Honor, I never—it was never me saying that I’m not going to testify. I feel like that if I’ve got to hold my part of the bargain, I feel like they should have too.”
On cross-examination, Defendant conceded that he was moved from facility to facility due to safety concerns. He admitted that Ms. Hall allowed him to call his family in an attempt to make bond and stated that he wrote the notation that he would not testify, but he urged that he wrote that “due to my bond.” The trial judge questioned him about the meaning of the notation:
Trial judge: Are you saying that somehow there’s a misunderstanding that they should not have, they being the district attorney’s office ... should not have taken from your letter where you say that, ’I’m not going to testify,” that you weren’t going to testify?
Young: Yes, sir. I—I told Ms, Angela Hall, I told her I was going to testify. I never told her I wasn’t.
Defendant then admitted that what he said in the letter was different than what he advised Ms. Hall later and in person.
The trial court took the matter under advisement and entered a written ruling on November 25, 2015, finding that Defendant breached the plea agreement by writing the notation; and, thus, the consecutive sentences Rwould remain in place. In so holding, it noted this court’s concern expressed in Young I that there was no evidence that he had “refused to testify” at the Warmack trial or that “the state had good grounds to believe” that he would not have testified. It then concluded: '
Clearly the letter from the Defendant declaring “I’m not going to testify” gavé the district attorney’s office sufficient confirmation that the defendant meant exactly what he wrote. Any assertions the Defendant was prepared to testify at the trial are contradicted by his own writings. As such, with Defendant’s declaration that he was not going to testify, the terms of the agreement for Defendant’s sentences to.run concurrent were no longer enforceable.
This appeal ensued.
DISCUSSION
Defendant complains that the trial court erred in concluding he was unwilling to fulfill his obligation under the plea agreement to testify truthfully at the War-mack trial. Thus, he submits that the imposition of consecutive sentences was a breach of the binding plea agreement. His argument relies heavily on this court’s opinion in Young I. He also asserts that the trial court took the margin notation out of context and that it did not consider the fact that the state subpoenaed him to testify and that he was present and willing to *912 testify on the day of the Warmack trial. He urges that it was error to consider only one phrase in one letter in light of all of the other circumstances and his actions, which evidenced his intent to testify and honor the plea agreement. He states that his guilty pleas rested heavily on the agreement of the state and that he is entitled to specific performance of the agreement.
The state maintains that Defendant “could not testify as a truthful witness” in the Warmack trial because his credibility was called into | flquestion by his statement in the letter. The DA was justified in not calling him as a witness based on his written refusal to testify. The state asserts that his plea agreement was based on his agreement to testify truthfully, as a credible witness, at the Warmack trial, which, by his own statement, he had compromised.
A district court’s findings as to whether a defendant has breached a plea agreement will be overturned only if clearly erroneous. State v. Adams, 04-77 (La. App. 3 Cir. 9/29/04), 884 So.2d 694, writ denied, 04-2709 (La. 2/25/05), 894 So.2d 1131, and writ denied, 04-2880 (La. 2/25/05), 894 So.2d 1132, citing United States v. Ballis, 28 F.3d 1399 (5th Cir. 1994); United States v. Gerant, 995 F.2d 505, 508 (4th Cir. 1993); United States v. Tilley, 964 F.2d 66 (1st Cir. 1992); United States v. Wood, 780 F.2d 929 (11th Cir.), cert. denied, 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986).
This court, in Young I, stated the following general precepts concerning the validity of plea agreements:
In determining the validity of plea agreements, Louisiana courts generally refer to rules of contract law, while recognizing at the same time that a criminal defendant’s constitutional right to fairness may be broader than his or her rights under contract law. State v. Givens, 1999-3518 (La. 1/17/01), 776 So.2d 443. The party demanding performance of a contract has the burden of proving its existence. State v. Louis, 94-0761, p. 7 (La. 11/30/94), 645 So.2d 1144 at 1149. In the context of plea bargains, a defendant may demand specific performance of the state’s promise if he can show that the parties reached an agreement, that he performed his part of the agreement, and that in doing so, he relinquished a fundamental right. Id. at 1149-50; see also, State v. Tanner, 425 So.2d 760, 763 (La. 1983).
Contracts have the effect of law for the parties and must be performed in good faith. La. C.C. art. 1983. A party has an implied obligation to make a good faith effort to fulfill the conditions of a contract. Bloom’s Inc. v. Performance Fuels, L.L.C., 44,259 (La.App. 2 Cir. 7/1/09), 16 So.3d 476, unit denied, 2009-2003 (La. 11/20/09), 25 So.3d 800. When there are reciprocal obligations, the obli-gor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation. La. C.C. art. 1993. Also, a party to a commutative contract may refuse to perform his obligation if the other has failed to perform. La. C.C. art. 2022.
A guilty plea is constitutionally infirm when the terms of the plea agreement are not honored. State v. Honeycutt, 41,601 (La.App. 2 Cir. 2/28/07), 953 So.2d 914; State v. Robinson, 33,921 La.App. 2 Cir. 11/1/00, 770 So.2d 868, citing State v. Dixon, 449 So.2d 463 (La. 1984). When a plea bargain is breached, the defendant has the options of specific performance or to withdraw the guilty plea. State v. Bouwell, 45,635 (La.App. 2 Cir. 9/22/10), 48 So.3d 335; State v. Davis, 41,430 (La.App. *913 2 Cir. 11/1/06), 942 So.2d 652; State v. Byrnside, 34,948 La.App. 2 Cir. 8/22/01, 795 So.2d 435.[2]
A contractual plea agreement was formed by the parties herein. Defendant agreed to plead guilty and testify against Warmack and the state agreed to a reduction of his bond and that his sentences would run concurrently. All parties agree that, though delayed, the bond was eventually reduced to $7,500. He was incarcerate ed the entire time the DA was preparing for the Warmack trial. During that time period, Defendant was threatened as a snitch and bond was not reduced in a timely fashion. Although the bond was eventually reduced, Defendant’s family was unable to provide the funds for even the reduced bond.
| uFor whatever reason, whether it was that the state intended to hold Defendant in custody until the Warmack trial, or that the state feared releasing him since he had two holds on him from the State of Arkansas, or simply the confusion related to the failure of communication between the state and BDCC, it cannot be said the state complied with the reduction of bond in a timely manner, and Defendant did not think that the state was upholding its part of the bargain.
These circumstances caused Defendant to write the May 21, 2014 letter to the DA, which specifically stated, “I am not going to testify.” This statement caused the DA to conclude that Defendant would not be a forthcoming, truthful and credible witness and chose not to call him at the Warmack trial, despite the fact that Defendant was transported to the courthouse, dressed and ready to testify.
The result of these circumstances is that there is enough fault to be divided equally between the state and this Defendant in breaching the plea agreement. The War-mack trial has concluded and the need for Defendant’s testimony has been negated. His testimony was his “bargaining chip” and the only reason the state offered him the plea agreement. He pled guilty to the two felonies with the understanding that his sentences would run concurrently after he testified. Since the opportunity for Defendant to testify has passed, this issue can only be resolved by either the prosecutor agreeing to the implementation of concurrent sentences of the original plea agreement or by allowing Defendant to withdraw his guilty plea.
| ^CONCLUSION
For the foregoing reasons, we vacate the trial court’s ruling that Defendant’s sentences shall run consecutively and remand with instructions that the prosecutor either accede to the original sentencing terms of the plea agreement or allow Defendant to withdraw his guilty plea. This decision shall be memorialized in open court in the presence of Defendant and his counsel.
If the prosecutor refuses to agree with the implementation of the concurrent sentences of the original plea agreement, Defendant shall then be allowed 30 days to withdraw his plea of guilty. Should Defendant refuse to withdraw his guilty plea during the 30-day period, the trial court *914 shall resentence him to consecutive sentences.
JUDGMENT REVERSED AND REMANDED WITH INSTRUCTIONS.
BROWN, C.J., dissents.

. The Warmack trial apparently did not take place until June 2014. At Defendant’s sentencing on June 30, 2014, the trial court noted that the Warmack trial had taken place “two weeks ago” and that Defendant had not testified.

. Compare—in cases involving a prosecutor’s agreement not to prosecute, constitutional principles dictate that, when the prosecutor in a criminal case himself causes the non-occurrence of the condition which would give rise to his obligation not to prosecute, the obligation becomes absolute. See United States v. San Pedro, 781 F.Supp. 761 (S.D. Fla. 1991); Jay M. Zitter, Annotation, Enforceability of Agreement By Law Enforcement Officials Not To Prosecute If Accused Would Help In Criminal Investigation Or Would Become Witness Against Others, 32 A.L.R.4th 990 (1984).